Brian W. LaCorte (012237)
Donna H. Catalfio (021827)
Ivan J. Mlachak (021939)
**GALLAGHER & KENNEDY, P.A.**
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000
E-mail: bwl@gknet.com; dhc@gknet.com; ijm@gknet.com
Attorneys for Plaintiffs/Counter-defendants
   GolfSwitch, Inc. and Spectrum Golf, Inc.

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| GolfSwitch, Inc., et al.,<br><br>Plaintiffs/Counter-defendants,<br><br>v.<br><br>Incuborn Solutions, Inc., et al.,<br><br>Defendants/Counter-claimants. | No.   CV06-1119-PHX-NVW<br>CV06-1406-PHX-NVW<br>(CONSOLIDATED)<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION TO RE-OPEN FACT DISCOVERY** |
| GolfSwitch, Inc.,<br><br>Plaintiff/Counter-defendant,<br><br>v.<br><br>TeeConnect, LLC, et al.,<br><br>Defendants/Counter-claimants. | (Assigned to the Hon. Neil V. Wake) |

If nothing else, one thing is clear from Cypress' Response – just how badly it wants to keep GolfSwitch from discovering highly relevant information in the purchase agreement between Cypress and Comcast. In its zeal to oppose even the mere disclosure of the purchase agreement under the strict confines of the protective order, Cypress has

1    repeatedly misstated the factual record and overstated the law.  In this Reply, GolfSwitch

2    sets the record straight.

3    **I.      THERE IS NO DISPUTE REGARDING SUPPLEMENTAL PRODUCTION**
         **OF UPDATED FINANCIAL RECORDS BEFORE TRIAL AND THE ISSUE**
4        **IS A RED HERRING HERE.**

5            Throughout its Response, Cypress attempts to direct the Court's attention to an

6    issue that has nothing to do with GolfSwitch's narrow motion to re-open discovery, and

7    even worse, raises a matter that is not even in dispute between the parties.  Cypress

8    contends that, by letter dated September 2, 2008, *Cypress* first proposed to GolfSwitch

9    that the parties exchange updated financial information, and GolfSwitch failed to respond

10   to this proposal before filing its Renewed Motion.  Cypress goes on to allege that this

11   circumstance demonstrates a failure by GolfSwitch to comply with the Court's Case

12   Management Order and L.R. Civ. 7.2(j).  *See* Cypress Response at p. 2-3.  Cypress'

13   position is as offensive as it is wrong.  GolfSwitch acted responsibly here and Cypress'

14   argument otherwise is a misstatement of the parties' efforts to cooperate on *unrelated*

15   *issues.*

16           The facts are these:  ***GolfSwitch***, not Cypress, originally memorialized a proposal

17   for disclosure of their respective updated sales and revenue before trial.  This

18   confirmation related to previous discussions about ordinary supplemental disclosures—

19   updates that were never considered a solution to the ongoing dispute over discovery

20   about Comcast's acquisition of Cypress.  Indeed, on May 29, 2008, Donna Catalfio

21   (counsel for GolfSwitch) wrote Cypress' counsel, Brett Dunkelman, confirming these

22   discussions and specifically stating that there were still sensitive issues surrounding

1    production of documents related to the Comcast acquisition that would be tabled given

2    on-going settlement discussions between the parties.  *See* Ms. Catalfio's May 29, 2008

3    letter, attached as ***Exhibit A.***  Ms. Catalfio went on to note that the purpose of her letter

4    was only to follow up on the discussion regarding updating financial records before trial,

5    not to resolve the dispute over records concerning the Comcast acquisition.  *Id.*

6            Notably, Cypress fails to make any mention of Ms. Catalfio's May 29 letter when

7    it suggests that updating records was its idea and that it somehow resolved this discovery

8    dispute.  Cypress' omission is particularly bothersome given that Mr. Dunkelman's

9    September 2 letter *directly references* Ms. Catalfio's May 29 letter.  *See*

10   Mr. Dunkelman's Letter dated September 2, 2008, attached as ***Exhibit B*** ("time appears

11   ripe for me to respond to your letters of May 19 and May 29, 2008").  More important,

12   Cypress' "proposal" in its September 2 letter to produce updated financial records was

13   nothing more than an affirmative response to GolfSwitch's proposal.  Mr. Dunkelman's

14   letter was not a meet and confer as to the acquisition issue and accomplished nothing

15   more than to confirm Cypress would not accept GolfSwitch's earlier efforts to

16   compromise.  And, as for the real dispute between the parties – the production of

17   Comcast acquisition documents – GolfSwitch demonstrated in the Motion its compliance

18   with the Case Management Order and local rules.

19           Putting aside this red herring, we now turn to the real issue at bench, our request

20   for an opportunity to discover relevant information about Comcast's acquisition of

21   Cypress.

22

1    **II.    APPROPRIATE STANDARD GOVERNING THE MOTION.**

2        Cypress attempts to muddy the waters by asserting that a heightened standard

3    governs GolfSwitch's Renewed Motion.  Cypress claims that there must be a showing

4    that the discovery sought is "critical or at least highly relevant to a claim or defense," but

5    cites no authority for this proposition.  *See* Cypress Response at p. 12.

6        There are really two standards that apply.  The first is whether GolfSwitch has

7    demonstrated "good cause" to re-open discovery.  The Ninth Circuit has held that "good

8    cause" focuses on "the reasonable diligence of the moving party."  *See* Renewed Motion

9    at p. 5, citing *Noyes v. Kelly Services*, 488 F.3d 1163, 1174 (9th Cir. 2007) and *Johnson*

10   *v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).  As GolfSwitch went

11   on to demonstrate in its Renewed Motion, and Cypress has not disputed, GolfSwitch

12   acted with diligence.  This ends the first inquiry.[1]

13       The second standard is whether the requested information is discoverable under

14   Fed. R. Civ. P. 26; in other words, does the information fall within the broad relevance

15   standard for discovery purposes?  Discovery relating to Comcast's acquisition of Cypress

16   clearly is likely to lead to relevant evidence.  Evidence related to how an independent

17   third-party valued the assets of Cypress and its infringing system tends to make the

18   [1] The first part of this two-step analysis is illustrated by the Ninth Circuit's decision in
     *Johnson.*  There, the plaintiff sought leave of court to amend his complaint to add a new
19   defendant.  Because the scheduling order set a deadline for amendment of pleadings, the
     Ninth Circuit held that the plaintiff's ability to amend his complaint was governed first by
20   Rule 16(b) and the "good cause" standard.  If "good cause" could be shown, then the
     plaintiff had to demonstrate the amendment was proper under the liberal standard of Rule
21   15.  *Johnson*, 975 F.2d at 608.

22

4

1  damages suffered by GolfSwitch for infringement more probable than it would be

2  without the evidence.  *See* Fed. R. Evid. 401.  We explore this more fully below.

3  **III.  INFORMATION RELATED TO COMCAST'S ACQUISITION OF CYPRESS IS CLEARLY RELEVANT TO GOLFSWITCH'S DAMAGES.**

4

   **A.  The Information is Relevant to Several Georgia-Pacific Factors.**

5  GolfSwitch has asked the Court to allow production of a narrow category of

6  documents that will tell GolfSwitch the exact purchase price of Cypress, the allocation of

7  that purchase price among various factors, including the infringing technology, and the

8  revenues projected for use of the infringing technology.  Common sense tells us this

9  information will be relevant to GolfSwitch's damages.  But before filing its Response,

10  Cypress had the benefit of reviewing the opening report of GolfSwitch's damages expert,

11  Mr. David Perry.  That report spells out exactly how this information is relevant.  Cypress

12  nonetheless still opposes the Motion.  Specifically, Mr. Perry demonstrates how

13  Comcast's acquisition of Cypress relates to three of the *Georgia-Pacific* factors (factors

14  used to determine a reasonable royalty):

15
   - Factor #8 – Product Success.  Mr. Perry opines the purchase price paid by
16     Comcast to acquire Cypress demonstrates the high expectations a leading
       company in the communications and media industry had for future profitability,
17     commercial success and popularity of the patented/infringing system.

18   - Factor #11 – Extent of Infringer's Use.  Mr. Perry opines the extent of Cypress'
       use of the infringing system and success it achieved using that system are
19     demonstrated, in part, by the sale of the business to Comcast and the price paid.

20   - Factor #15 – Hypothetical License Amount.  Mr. Perry determined a reasonable
       royalty here would have two components:  (i) $1.50 royalty for each round of golf
21     booked using the infringing system; and (ii) a lump-sum payment, either (a) in the
       form of a substantial up-front license fee, or (b) in the form of a term providing
22     added return to GolfSwitch if Cypress was highly successful.  The parties would

5

1       have agreed the successful acquisition of Cypress would be a triggering event for
the latter, and the payment owed GolfSwitch would likely be quantified in terms
2       of a percentage of proceeds Cypress received in the acquisition.[2]

3       For now, Mr. Perry's report and calculations are based on the purported purchase

4    price of Cypress and nothing more.  Clearly, knowledge of the actual purchase price, its

5    allocation and the information supporting the price (including projections) would allow

6    Mr. Perry to test the accuracy of his calculations and/or determine whether his royalty

7    should be adjusted-- royalties are frequently set based on these very types of projections.

8           **B.       Case Law Does Not Rule Out the Purchase of an Infringer's Business
as Relevant to Patent Infringement Damages.**
9
Cypress claims that "the Federal Circuit has twice held that a patent owner may
10
*never* assert damages based upon the price a third party pays to acquire the business of
11
the accused infringer," citing *Transclean* and *Minco.*  Cypress overstates the holdings of
12
these cases.
13
**1.       *Transclean.***
14
In *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364 (Fed. Cir. 2002),
15
the patent owner (Transclean) tried to claim it was entitled to a percentage of the sale
16
price of the infringer's business, without consideration of which portion of the sale
17
proceeds could actually be allocated to the infringing goods as opposed to the goodwill of
18
the company.  The Federal Circuit determined that the portion of the sales price
19
consisting of goodwill could not form the basis for determination of a reasonable royalty.
20
_____
21   [2] Mr. Perry states in his report, and will testify under oath, that he is familiar with many
license agreements that provide a party additional compensation in the case of an
22   acquisition.

1    *Id.* at 1376.  And, as a matter of proof, Transclean had not established the amount of the

2    proceeds that were allocated to compensation of tangible assets as opposed to goodwill.

3    Transclean responded by asserting that *all* of the goodwill associated with the infringer's

4    business was attributable to patent infringement, but the Federal Circuit agreed with the

5    district court that this assertion was belied by other evidence in the case.  As a result,

6    Transclean was not entitled to recover any amount of the sale proceeds.  *Id.* at 1377.

7          The damages theory advanced by Transclean is different from that advanced by

8    GolfSwitch.  GolfSwitch asserts that the parties would have negotiated a percentage of

9    proceeds of the sale of Cypress to satisfy GolfSwitch's demand for a lump-sum license

10   fee as part of the hypothetical negotiation.  Moreover, Mr. Perry makes no claim to all of

11   the goodwill associated with Cypress.  Therefore, *Transclean* is inapplicable here.

12         Further, the Federal Circuit neither held nor stated anywhere in *Transclean* that the

13   purchase price of an infringer's business is *irrelevant* to damages.  In fact, the court

14   expressly stated:  "Whether or not proceeds from the sale of a business including tangible

15   assets such as infringing inventory would be compensable as a remedy for patent

16   infringement we are not in a position to say; that case is not before us."  *Id.* at 1376.  The

17   court also noted that "[t]he most relevant inquiry [regarding the amount of damages

18   Transclean was entitled to recover] would seem to be the amount of the business's value

19   that is attributable to the patent infringement."  *Id.* at 1376.  Here, GolfSwitch seeks the

20   very information the court noted would likely be the "most relevant" from a sale.

21              **2.      *Minco.***

22         In *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109 (Fed. Cir. 1996), the

7

1   patent owner (Minco) sought as damages the difference between the actual sales price

2   and the expert's valuation of the infringer's business without the infringing device.

3   Minco alleged that the excess sales price constituted part of its lost profits.  *Id.* at 1120.

4   The Federal Circuit upheld the trial court's refusal to grant this award because Minco did

5   not show that the infringing devices were an important factor in the sale (upon acquiring

6   the infringer's business, the new owner switched to a non-infringing device).  *Id.* at 1121.

7          Again, *Minco* involved a different theory than that advanced by GolfSwitch.

8   Indeed, post-purchase, Cypress continues to infringe.  And, as in *Transclean*, the Federal

9   Circuit only rejected the particular damages theory advanced by the patent owner, not the

10  reliance on sale proceeds of an infringing business altogether.  In fact, the Federal Circuit

11  noted that "in theory Minco might have been entitled to some recovery from [the

12  infringer's] sale of its business because it included infringing [devices]."  *Id.*  at 1120.

13         **C.      Actual v. Projected Revenues.**

14         Finally, Cypress asserts production of updated actual financials before trial will

15  render the need for projected revenues that may have been created or relied upon during

16  the acquisition meaningless.  This is simply not the case.

17         First, projected revenues, as well as actual revenues, are relevant to product

18  success (Georgia-Pacific factor #8), and could be considered by the parties during the

19  hypothetical negotiation (Georgia-Pacific factor #15).  Second, in its Response, Cypress

20  concedes that financial projections created before the patent issuance date are highly

21  relevant to the hypothetical negotiation, despite the fact that Cypress has produced actual

22  revenue data for the projected time period.  *See* Cypress Response at p. 11.  There is no

1    reason that projections created after this date are not equally as relevant, despite Cypress'

2    willingness to produce actual revenue data for that period.  Cypress relies simply on the

3    fact that the projections were created after infringement to argue they are irrelevant.  This

4    argument is debunked below.

5         Finally, a gap between the last date for Cypress' actual revenue data and trial is

6    unavoidable.  Mr. Perry will use the projected data to fill in that gap.

7    **IV.    COURTS UNIFORMLY RECOGNIZE THAT EVENTS AND
         INFORMATION SUBSEQUENT TO THE DATE OF  INFRINGEMENT**
8    **MAY BE RELEVANT TO A REASONABLE ROYLATY.**

9         Cypress cites *Unisplay* and *Wang* in support of the legal principle that the

10   hypothetical reasonable royalty negotiation must take place on the date infringement

11   began-- in this case, the date the patent issued (March 21, 2006).  We agree.  But the

12   issue here is whether information that *did not exist at the time of the negotiation* can be

13   considered in calculating a reasonable royalty.  The United States Supreme Court and the

14   Federal Circuit have answered this question with a resounding "yes."

15        The issue was first addressed by the United States Supreme Court in *Sinclair Ref.*

16   *Co. v. Jenkins Petroleum Co.*, 289 U.S. 689 (1933).  In that case, plaintiff loaned

17   defendant a still for producing gasoline.  Defendant agreed to assign any improvements it

18   made to the still to plaintiff.  Defendant later obtained a patent to which plaintiff claimed

19   an interest pursuant to this agreement.  Defendant refused to assign the patent, forcing

20   plaintiff to sue for damages under a breach of contract theory.  *Id.* at 690-91.

21        During discovery, plaintiff was denied information as to the number of stills

22   constructed by defendant under its patent, the extent and time of operation, and the

9

1  amount of gasoline yielded by the stills.  The trial court sided with the defendant and held

2  that since damages for breach are assessed as of the time of the breach, the value of the

3  patent at that time was unrelated to any greater value it later obtained.  Thus, the trial

4  court deemed evidence of post-breach commercial success irrelevant.  *Id.* at 691-92.

5        The Supreme Court disagreed.  Justice Cardozo explained that, if trial is shortly

6  after the breach, "the only evidence [of a patent's value] may be that supplied by

7  testimony of experts as to the state of the art, the character of the improvement, and the

8  probable increase of efficiency or saving of expense."  *Id.*  at 698.  However, if trial is

9  years after the breach, "[e]xperience is then available to correct uncertain prophecy.  Here

10  is a book of wisdom that courts may not neglect.  We find no rule of law that sets a clasp

11  upon its pages, and forbids us to look within."  *Id.*   Justice Cardozo went on to state:

12  "[t]o correct uncertain prophecies in such circumstances is not to charge the offender

13  with elements of value non-existent at the time of his offense.  It is to bring out and

14  expose to light the elements of value that were there from the beginning."  *Id.* at 698.

15        Fifty-five years later, the Federal Circuit adopted the *Sinclair Refining* rationale

16  for flexibility – the "book of wisdom" – and applied it to the hypothetical negotiation

17  method of calculating damages in patent infringement cases.  *Fromson v. Western Litho*

18  *Plate and Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988).  The Federal Circuit noted:

19        The [hypothetical negotiation] methodology encompasses fantasy and
       flexibility; fantasy because it requires a court to imagine what warring
20        parties would have agreed to as willing negotiators; flexibility because it
       speaks of negotiations as of the time infringement began, yet permits and
21        often requires a court to look to events and facts that occurred thereafter

22

1    and that could not have been known to or predicted by the hypothesized
      negotiators.

2  *Id.* at 1575.

3    Here, GolfSwitch is entitled to examine the "wisdom" that is represented by the

4  Comcast acquisition, despite the fact that the acquisition occurred after the March 21,

5  2006 date of the hypothetical license negotiation.  Again, it is quite telling that Cypress

6  raises no objection to production of actual information for dates after March 21, 2006.

7  The same should apply to the actual Comcast purchase agreement.

8  **V.    CONCLUSION.**

9    GolfSwitch cannot overstate that the question before the Court is only whether

10  GolfSwitch can *discover* information related to Comcast's acquisition of Cypress.

11  Cypress is free at trial to object to admission of the evidence and/or to challenge any

12  expert's reliance on it.  For now, GolfSwitch has clearly demonstrated good cause for

13  bringing its Motion and has shown it is entitled to the requested material under the liberal

14  right of discovery recognized in this jurisdiction.  *See Shoen v. Shoen*, 5 F.3d 1289, 1292

15  (9th Cir. 1993).   The Motion should be granted.

16    RESPECTFULLY SUBMITTED this 10th day of October, 2008.

17    **GALLAGHER & KENNEDY, P.A.**

18
      By:s/ *Brian W. LaCorte* _____

19    Brian W. LaCorte
      Donna H. Catalfio

20    Ivan J. Mlachak
      Attorneys for Plaintiffs/Counter-defendants

21    GolfSwitch, Inc. and Spectrum Golf, Inc.

22

11

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on October 10, 2008, I electronically transmitted the attached document to the Clerk of the Court using the CM/ECF System for filing, and transmittal

3    of a Notice of Electronic Filing to all party CM/ECF registrants:

4    Johnathan E. Mansfield (Admitted Pro Hac Vice)  (jmansfield@schwabe.com)
Yvonne E. Schindler (Admitted Pro Hac Vice)   (yschindler@schwabe.com)

5    **SCHWABE WILLIAMSON & WYATT, P.C.**
PacWest Center 2

6    1211 SW 5th Avenue, Suite 1600-1900
Portland, Oregon 97204

7    *Attorneys for Defendants/Counter-claimants Incuborn Solutions, Inc.,*
*Golfnow, Inc. and Michael Loustalot*

8
Brett L. Dunkelman  (bdunkelman@omlaw.com)

9    **OSBORN MALEDON, P.A.**
2929 N. Central Avenue, 21st Floor

10   Phoenix, Arizona 85012-2793
*Attorneys for Defendants/Counter-claimants Incuborn Solutions, Inc.,*

11   *Golfnow, Inc. and Michael Loustalot*

12   Michael J. LaVelle    (mjl@lavelle-lavelle.com)
Matthew K. LaVelle   (mkl@lavelle-lavelle.com)

13   **LAVELLE & LAVELLE, PLC**
2525 East Camelback Road, Suite 888

14   Phoenix, AZ 85016
*Attorneys for Defendants/Counter-claimants TeeConnect, LLC,*

15   *Open Course Solutions, LLC, Heritage Golf Group, LLC, and*
*Heritage Golf Group, Inc.*

16
s/      *Karen J.*

17   1923520/14630-0005

18

19

20

21

22

12